# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **KARLIN McCOLLOUGH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:16-cv-00438-AKK** |
| **BUFFALO ELECTRIC COMPANY** | ) | |
| **OF ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Karlin McCollough brings this case against the Buffalo Electric Company of Alabama under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. McCollough alleges that Buffalo unlawfully retaliated against him by suspending and then discharging him after he complained about ongoing racial discrimination in the company warehouse where he worked. Buffalo has filed a motion for summary judgment, doc. 15, and that motion is now fully briefed, docs. 17; 22; 23, and ripe for review. After carefully considering the parties' briefs and the record, the court finds that questions of material fact preclude summary judgment in favor of Buffalo. Accordingly, Buffalo's motion is due to be denied.

## II. STANDARD OF REVIEW

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. It is expressly not the role of the court to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). "[A] . . . 'scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). Instead, if "the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is appropriately granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III. FACTS

The following facts reflect the court's assessment of the record in the light most favorable to McCollough. Buffalo, a family-owned electrical supply business located in Birmingham, Alabama, hired McCollough through a temporary employment agency in January of 2013. Doc. 17 at 3–4. Buffalo mostly used temporary workers to fill its warehouse related positions due to their relatively high employee turnover rates. *Id.* at 4. Although McCollough characterized his position as delivery/sales, doc. 17-6 at 8, most of his daily duties involved working in Buffalo's warehouse. Doc. 17-6 at 7–9. At the time of his hiring, all four of the warehouse associates employed by Buffalo, including McCollough, were African-American. Doc. 17 at 5.

McCollough's first months of employment passed without incident, and on May 6, 2013, Buffalo hired him as a regular employee. *Id.* at 6.[1] A few weeks later, Buffalo hired Mike Glover, a white man, as a new sales representative. *Id.*

---

[1] McCollough apparently left Buffalo for a week to pursue a separate employment opportunity. Doc. 17 at 6. McCollough returned to Buffalo when the other position fell through. *Id.*

Doc. 22 at 21. As part of Glover's initial training for this position, Buffalo assigned him to the warehouse where he worked closely with McCollough. Docs. 17 at 6–7; 17-6 at 29. When Glover completed his warehouse training, he assumed a position in sales. Doc. 17 at 6.

McCollough perceived Glover's placement in sales as evidence of racial disparity in Buffalo's employment decisions since he had previously expressed interest in a sales position and was never considered for the position that Glover filled. Doc. 17-6 at 13. McCollough was upset enough over this hiring decision to ask Stephen Schneider, the warehouse manager, for a workplace grievance form. *Id.* at 9, 11–14.[2] Schneider informed McCollough that Buffalo did not have grievance forms, but that McCollough could write down his complaint on a sheet of paper and discuss the matter with Schneider at a later time. *Id.* at 11; Doc. 17-4 at 16. It is undisputed that McCollough never made a written complaint regarding alleged racial discrimination at Buffalo, doc. 17-6 at 11, and it took over six months for him to follow up with management regarding his concerns, *id.* at 17.

_____

[2] McCollough also alleges the existence of other disturbing conduct including the use of racial slurs by Tom McCarroll, Buffalo's President, as an impetus behind his initial complaint to Schneider. It is undisputed that on at least one occasion Tom McCarroll referred to the African-American warehouse workers as "monkeys." Doc. 17-2 at 9. McCollough also alleges that Tom McCarroll targeted him directly with racial epithets on at least two occasions. Doc. 17-6 at 9–10. Further, as he would later bring to management's attention, McCollough felt that white employees received better pay than their African-American counterparts, and that whites were typically hired directly rather than through a temporary employment agency. *Id.* at 9; 11; 20

4

In November 2013, Buffalo promoted Schneider and filled his position of warehouse manager with Winfred Stewart, one of McCollough's African-American co-workers. Doc. 17 at 7–8. The record overwhelmingly indicates that McCollough did not readily accept Stewart's promotion. Among other things, McCollough frequently refused to follow Stewart's directives and repeatedly attempted to trick Stewart into completing unnecessary tasks. Docs 17-3 at 26–27; 17-7 at 13–14; 17-9 at 18–19. This pattern of behavior prompted Stewart to reach out to Patrick McCarroll, Buffalo's then Vice-President, for assistance in dealing with McCollough. Doc. 17-3 at 26. In response to Stewart, McCarroll drafted a strongly-worded memorandum explaining that the "acts of insubordination" occurring since Stewart's promotion were unacceptable. *Id.* at 27; Doc. 17-5 at 13. On December 20, 2013, Stewart presented the document to all warehouse employees requiring them to sign the document or "go home." Doc. 17-7 at 14–15.

It is undisputed that McCollough failed to initially sign the memorandum, but the record is unclear regarding what happened following his refusal. Doc. 17-6 at 19. McCollough testified that he simply wanted time to read the document and did not adamantly oppose signing it. *Id.* Stewart and McCarroll contradict this assertion indicating that McCollough acted insubordinately toward Stewart and demanded to meet with McCarroll before signing the document. Docs 17-3 at 38–

39; 17-7 at 15.  In either event, McCarroll went to the warehouse floor and spoke with McCollough shortly after Stewart presented the memorandum to the company's warehouse associates. Doc. 17-3 at 38.

The two men engaged in what quickly became a heated conversation.  *Id.* at 39.   McCollough reiterated many of his workplace grievances to McCarroll, including concerns over differences in pay and advancement opportunities between white and African-American employees, the use of racial slurs in the workplace, and McCollough's inability to file a grievance related to these issues.  Doc. 17-6 at 20–21.   McCarroll grew increasingly agitated during the conversation and eventually accused McCollough of calling him a racist stating "you are pushing me against a corner . . . I can't have you saying I am a racist and we [Buffalo] are discriminating."  Doc. 22 at 10.  Buffalo now admits that McCollough signed the memorandum in question, albeit outside of the presence of Stewart and McCarroll. Doc. 17-3 at 39.

Later that same day, December 20, 2013, McCarroll and Stewart had a discussion in which McCarroll told Stewart to suspend McCollough with pay.  *Id.* at 28.   Immediately thereafter, McCollough filed a charge with the Equal Employment Opportunity Commission asserting that Buffalo had suspended him in retaliation for his complaints about the company's allegedly discriminatory

employment practices.  Doc. 21-8 at 2–3.[3]  Ten days later, after consultation with McCarroll, Stewart formally discharged McCollough.  Doc. 17-7 at 18–20.

## IV. DISCUSSION

In addition to protecting employees from discriminatory practices in the workplace, Title VII also provides a remedy for "employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013) (citing 42 U.S.C. § 2000e–3(a)).  To establish a *prima facie* case of retaliation, the plaintiff is required to show that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).[4]

Buffalo asserts that it is due summary judgment because McCollough did not engage in statutorily protected activity, and, alternatively, that no causal connection existed between any purported protected activity and the adverse

---

[3] Buffalo received notice of the EEOC charge well after McCollough's discharge.  Doc. 17-3 at 31.  Therefore, the EEOC filing has no bearing on this court's analysis of McCollough's retaliation claim.

[4] Section 1981 and Title VII retaliation claims share the same analytical framework and have identical requirements of proof.  *See, e.g.*, *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (holding that both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework").  Accordingly, this court's Title VII analysis applies equally to McCollough's § 1981 claim.

employment actions taken by the company.  This court will address each contention in turn.[5]

## A. Statutorily Protected Activity

Buffalo first contends that McCollough was not acting in good faith when he complained about racial discrimination in the warehouse and, in any event, that McCollough's complaint was not objectively reasonable.  An employee engages in a protected activity when she is able to show she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier TransiCold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  Thus, a plaintiff's burden under this standard has both a subjective and an objective component.  *Id.*  The plaintiff must both "*subjectively* (that is, in good faith) believ[e] that [her] employer was engaged in unlawful employment practices, [and] . . . that . . . belief [must be] *objectively* reasonable."  *Id.*  Accordingly, the Eleventh Circuit has found that employees engage in protected activity by "voicing complaints of discrimination to [a] supervisor."  *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002).

---

[5] The parties agree that McCollough's suspension with pay and his subsequent discharge are materially adverse employment actions.  The Eleventh Circuit has explained that "[i]n deciding whether employment actions are adverse,  . . . [the court considers] the employer's acts both individually and collectively."  *Akins v. Fulton Cty.*, 420 F.3d 1293, 1301 (11th Cir. 2005).  Thus this court need not address whether McCollough's suspension, standing alone, constitutes an adverse employment action, although there is substantial precedential authority to support such a finding.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920 (11th Cir. 1993) (flatly stating "plaintiff was the subject of an adverse employment action; he was suspended with pay for thirty days").

At the summary judgment stage, this court finds that McCollough had a good faith belief that Buffalo was engaging in unlawful employment practices. Before complaining to McCarroll, McCollough asked for a grievance form from his then manager, Schneider, in response to perceived racial disparities in pay and hiring practices and the use of racial slurs in the warehouse. Doc. 17-6 at 9, 11–14. Indeed, McCollough went so far as to begin recording his interactions with management employees surreptitiously in an attempt to document the racially abusive language he alleges he was subjected to on an ongoing basis. *Id.* at 24. Seeking to document racial discrimination is not evidence of bad faith as Buffalo argues. Instead, it convincingly demonstrates that the plaintiff was truly concerned with the existence of workplace discrimination. Courts have repeatedly noted that establishing a *prima facie* case for Title VII retaliation is not a difficult hurdle to surmount, *see Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988), and accordingly McCollough has provided a more than sufficient evidentiary foundation to satisfy the good faith component of the inquiry.

The court also finds that McCollough's belief regarding the existence of alleged racial discrimination in the workplace was objectively reasonable. While this inquiry is conducted in reference to "the controlling substantive law in this circuit," the employment practice complained of need not "actually [be] unlawful." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). There is

simply no requirement that the opposed conduct qualify as unlawful racial discrimination, it must simply "'be close enough to support an objectively reasonable belief that it is.'" *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

Controlling law provides that, among other things, racial discrimination in terms of pay and advancement opportunities are illegal. *See Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001) (recognizing a cause of action under Title VII for "discriminatory failure to promote"); *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993) (recognizing "race based, discriminatory wage payments" as a violation of Title VII). And, there is sufficient evidence in the record to support an objectively reasonable belief that Buffalo engaged in both of these practices.

Employment records from 2013 indicate that Buffalo paid a brand-new hire, Kirby Gray, a white man working as a warehouse associate, an hourly wage that was at least $1.50 higher than that of any of the more experienced African-American warehouse associates. Docs. 17 at 7; 21-2 at 5. The record further reflects that Buffalo hired Gray directly rather than through a temporary agency. Doc. 17 at 7. Buffalo also hired Mike Glover, another white man, directly rather than through a temporary agency. *Id.* at 6; Doc. 17-3 at 30. After temporarily

assigning Glover to the warehouse, Buffalo placed him in counter-sales, a position that McCollough asserts he was qualified for and had previously expressed an interest in filling.  Docs. 17-6 at 12–14; 17-3 at 30.  A third white man, Richard Davis, was also directly hired on October 14, 2013 to work in internet sales.  Doc. 21-11 at 4.  These employment decisions occurred within the broader context of a work-environment where the President of Buffalo, Tom McCarroll, referred to African-American warehouse associates as "monkeys" on at least one occasion.  Doc. 17-2 at 9.  McCollough also avows that Tom McCarroll specifically directed racial epithets at him on at least two other occasions.  Doc. 17-6 at 9–10.

It may well be true, as Buffalo asserts, that it historically hired both white and African-American employees through temporary agencies.  Doc. 17 at 5.  But, during the time of McCollough's employment, the record evidence shows that African-American employees were hired through a temporary agency and worked in the warehouse while Buffalo hired white employees directly placing them in better paying positions.  Docs. 21-2 at 5; 21-11 at 4.  It may also be true that McCollough and the other African-American warehouse associates were not similarly situated to Gray and Glover in terms of their qualifications, and so Buffalo had a legitimate non-discriminatory reason to treat these individuals

differently.  Doc. 17 at 21.[6]  But, establishing a *prima facie* case of race discrimination is "not onerous."  *Watson*, 487 U.S. at 986 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  And McCollough need not even go that far.  Instead, he need only show that the conduct he challenges was "close enough [to unlawful conduct] to support an objectively reasonable belief that it is [ actually unlawful]."  *Clover*, 176 F.3d at 1351.  The apparent discrepancies that existed at the time McCollough made his complaint, taken together with McCollough's allegations of racial epithets directed toward African-American employees by Buffalo's management, create an objectively reasonable foundation for McCollough's stated belief that Buffalo was engaging in illegal employment discrimination on the basis of race.

B. *Causal Connection*

Buffalo also argues that McCollough cannot demonstrate a causal connection between the complaints he made regarding Buffalo's purportedly discriminatory employment practices and his suspension and discharge.  To carry his burden on this point, McCollough must provide "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Nassar*,

---

[6] Buffalo claims that it hired Glover directly for the sales position and required him to spend time with McCollough in the warehouse to learn all different aspects of the business.  Doc. 17 at 6.  But, at the time of Glover's hiring, Buffalo did not notify employees of open positions and had no system for current employees to apply for different jobs internally.  Doc. 17-3 at 13–14.  So, a reasonable person in McCollough's position would never have realized that Buffalo had a vacancy in sales until Glover was seemingly promoted into it.

133 S. Ct. at 2528.  In other words, he must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 2533.[7]

The plaintiff may supply the requisite causal connection via either direct evidence, or, more commonly, circumstantial evidence.  Direct evidence is "evidence which if believed, proves the existence of [the] fact in issue without inference or presumption.  Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations and quotations omitted).  Controlling precedent provides that "'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of [retaliation]."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002)).

McCollough contends that his conversation with McCarroll, on the day of his initial suspension, in connection with the close temporal proximity between

---

[7] The Eleventh Circuit has not yet addressed whether this causal standard is properly applied at the *prima facie* stage of the analysis or later, at the pretext stage of the familiar *McDonnell Douglas* burden-shifting framework common to employment cases.  *See Pace v. Alfa Mut. Ins. Co.*, 178 F. Supp. 3d 1201, 1210 n.5 (M.D. Ala. 2016) (citing *Murphree v. Comm'r*, 644 F. App'x 962, 968 (11th Cir. 2016).  Because this court has determined that McCollough's claims survive under the traditional *McDonnel Douglas* framework predating *Nassar*, it is unnecessary to resolve this question.  *See Murphree*, 644 F. App'x at 968.

that conversation and his suspension, provides direct evidence of retaliation. Although temporal proximity between a protected activity and an adverse employment action does constitute evidence of causation, the evidence here is merely circumstantial because it requires an inference of discriminatory intent. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (explaining that very close temporal proximity is "sufficient circumstantial evidence of a causal connection for purposes of a prima facie case"). Relevant here, McCarroll's statement to McCollough that "you are pushing me against a corner . . . I can't have you saying I'm a racist and we are discriminating,"[8] is not the sort of "blatant remark" evidencing intent to retaliate that qualifies as direct evidence of discrimination in this circuit. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270–71 (11th Cir. 2017) (finding that a remark about plaintiff's suspension based on abuse and misuse of FMLA leave did not constitute direct evidence of retaliation for exercising FMLA rights); *Merritt*, 120 F.3d at 1190 (finding that a statement to "fire [the plaintiff]—he gave the most damning deposition testimony" constituted direct evidence of retaliation); *Wright v. Southland Corp.*, 187 F.3d 1287, 1305–06 (11th Cir. 1999) (finding that direct evidence of retaliation existed when a human resources specialist asked if the

---

[8] The parties vehemently disagree over the content of this conversation, and only a portion of the recording McCollough made is audible. Doc. 17 at 153. The audible portion includes no indication that McCollough actually called McCarroll a racist. Doc. 17-3 at 29. But, the recording does make clear that McCarroll thought McCollough had accused him of racism. *Id.* at 29, 49.

14

plaintiff was willing to drop an EEOC complaint before informing the plaintiff that he "[would] regret" failing to do so).

At best, McCarroll's remarks suggest that he was upset about McCollough's claims of discrimination. However, a second inferential step is required to establish that McCollough's claim of discrimination provided the basis for his suspension and subsequent discharge. Accordingly, this conversation cannot provide direct evidence of a causal connection between the adverse employment action and the protected activity.[9]

McCollough's evidence of retaliation is instead properly considered circumstantial evidence. In the Title VII context, claims of retaliation relying on circumstantial evidence are evaluated under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). This framework requires the plaintiff to first establish a *prima facie* case creating a presumption that any adverse employment action suffered was the result of retaliation. *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009). The burden of production then shifts to the defendant to rebut the presumption by "articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1308. Finally, to

---

[9] Further, evidence that is subject to more than one interpretation does not constitute direct evidence of retaliation. *See Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir. 1996). Here, the statement by McCarroll is plainly subject to another reasonable interpretation—that McCollough actually called him a racist. As such, the proffered statements do not constitute direct evidence of retaliation.

prevail, the plaintiff must show that the defendant's proffered reason is a mere "pretext to mask [retaliatory] actions." *Id.*

Here, McCollough easily carries his *prima facie* burden on the causal prong simply via the extremely close temporal proximity between his suspension and his complaint—both occurred on the same day. *See Brown*, 597 F.3d at 1182 (finding that a "very close" temporal relationship between the temporal activity and the adverse employment action was sufficient to establish "an inference of retaliation").[10] However, Buffalo has put forward significant evidence advancing a legitimate non-retaliatory rationale for McCollough's suspension and discharge, i.e. repeated instances of insubordination. McCollough's immediate supervisor, Stewart, testified that although he was sympathetic to McCollough's frustrations, McCollough repeatedly refused to comply with his instructions and otherwise failed to fulfill the basic duties asked of him. Doc. 17-7 at 13–14. Stewart memorialized these difficulties in an employment evaluation which indicated that McCollough had problems at work, even though Stewart personally liked him. Doc. 21-7 at 2.

---

[10] Buffalo argues that McCarroll was not the decision maker with respect to McCollough's discharge and so the warehouse encounter between the two men was totally unrelated to the adverse employment actions suffered by McCollough. However, McCollough has provided sufficient evidence that McCarroll made the decision to suspend and discharge him. Indeed, McCarroll testified that he decided to initially suspend McCollough following their confrontation. Doc. 17-3 at 28. Further, there is no dispute that Stewart consulted with McCarroll before discharging McCollough. Doc. 17-7 at 18–20. Stewart also testified that he always consults with McCarroll about employment decisions, suggesting that McCarroll had control over employment decisions. *Id.* at 20.

Stewart's account is corroborated by other warehouse employees who testified that after Stewart's promotion McCollough was repeatedly insubordinate and exhibited bad behavior ranging from refusing to comply with Stewart's instructions to tricking Stewart into performing extra work. Docs. 17-3 at 26–27; 17-8 at 12; 17-9 at 18–19. Kirby Gray, who worked with McCollough for only a few days, even wrote a letter to management reporting McCollough's insubordinate attitude toward Stewart. Doc. 17-10 at 1.

Stewart also testified that disciplinary problems with McCollough escalated so badly that he was forced to go to McCarroll for assistance in gaining control over the situation. Doc. 17-7 at 14. It was this meeting that led to McCarroll's preparation of a memo indicating that Stewart had the full support of the company and discretionary authority to discipline and terminate warehouse employees. *Id.*; Doc. 17-3 at 26–27. Notably, the memorandum in question was prepared in advance, before McCarroll was aware of McCollough's complaints of a racially discriminatory workplace and was designed to serve as Buffalo's official response to McCollough's poor workplace attitude. *Id.* at 27. This evidence more than suffices to establish a legitimate ground for McCollough's termination.

To survive summary judgment then, McCollough must "either directly . . . persuad[e] the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." *Burdine*, 450 U.S. at 256. This may be accomplished using "the previously produced evidence establishing the prima facie case." *Jones*, 854 F.3d at 1274. But, the plaintiff must present enough evidence "'to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision'" and accordingly infer that unlawful retaliation was the real reason for that adverse action. *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)). This showing of pretext may also be established via a demonstration of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc)).

On this record, McCollough has succeeded in putting forward sufficient evidence to create a genuine issue of material fact with respect to whether Buffalo's proffered reasons for his discharge are mere pretext for an underlying retaliatory motive. First, McCollough has produced evidence directly pointing out "inconsistencies . . . or contradictions" in Buffalo's rationale for the adverse employment action it took against him. *Combs*, 106 F.3d at 1538. Contrary to Buffalo's post-litigation explanation that it suspended and ultimately discharged

McCollough primarily due to his repeated insubordination and poor performance at work—pointing toward the incident involving the warehouse memorandum as the final link in the long chain of unacceptable behavior—Buffalo, in a telephonic hearing before the Alabama Department of Labor regarding McCollough's application for unemployment benefits, explained that McCollough's refusal to sign the warehouse memorandum and the fact that he called McCarroll a racist was "the main gist" of the company's reason for terminating him. Doc. 21-10 at 12–13. Similarly, in a letter sent to the Alabama Department of Labor, Buffalo asserted that McCollough had called McCarroll a racist and that this confrontation reflected McCollough's "bad attitude" providing the principal reason for his discharge. Doc. 21-9 at 3. In yet another letter, this time sent to the EEOC, Buffalo indicated, inaccurately, that Stewart made the decision to initially suspend McCollough. Doc. 21-1 at 3.[11] This letter also suggested that the decision to suspend McCollough was directly related to the interaction he had with McCarroll. *Id.* These explanations are directly inconsistent with the post-hoc rationale articulated by Buffalo in this litigation and, accordingly, are sufficient to establish pretext. *See Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) (finding that an employer's "shifting explanation for its actions" demonstrated pretext); *see also Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189,

_____

[11] McCarroll's deposition testimony directly contradicts this account as he testified that he made the decision to suspend McCollough initially on December 20, 2013. Doc. 17-3 at 26–28.

1193–94 (11th Cir. 2004) (explaining that shifting reasons offered by an employer constituted evidence allowing a jury to reasonably find pretext).

Perhaps most significantly, the evidence McCollough provided to support his *prima facie* case very strongly suggests the presence of a retaliatory motive. First, there was essentially no delay at all between McCollough's protected complaint of racial discrimination and his suspension. Doc. 17 at 13–17. In other cases, delays as long as a month between protected activity and an adverse employment action have been sufficient to create a retaliatory inference. *Higdon*, 393 F.3d at 1220 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)). Second, the undisputed record evidence indicates that Buffalo had already planned to deal with McCollough's poor performance and insubordination through the warehouse memorandum prepared by McCarroll. Doc. 17-3 at 27. Both Stewart and McCarroll testified to as much. *Id.*; Doc. 17-7 at 14. There is simply no support in the record to indicate that Buffalo contemplated any further disciplinary action against McCollough before his meeting with McCarroll. And, the record clearly shows that McCarroll reacted angrily when McCollough sought to raise his concerns about racial discrimination during that meeting. Doc. 17-3 at 39. Taken as a whole, these circumstantial factors support an inference that McCarroll made the decision to suspend and

ultimately discharge in direct response to McCollough's complaints of race discrimination.[12]

Viewed in the light most favorable to McCollough, Buffalo's contradictory explanations for its actions, when combined with the exceedingly strong circumstantial evidence of retaliation, creates a strong inference that Buffalo's stated reason for discharging McCollough was pretextual. The parties have presented enough evidence to allow the court to characterize the events surrounding McCollough's suspension and discharge in two ways. Either McCollough's pattern of insubordination reached a tipping point after he refused to comply with a direct company directive and engaged in a heated confrontation with senior management, or Buffalo was content to retain McCollough until he lodged a complaint of racial discrimination, which angered management and directly led to the adverse employment action. This is a quintessential dispute of material fact and accordingly summary judgment is not appropriate at this juncture.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Buffalo's Motion for Summary Judgment, doc. 15, is **DENIED.**

---

[12] McCarroll asserts that he became upset because of McCollough's insubordinate attitude. Doc. 17-3 at 44–45. It is clear from his deposition that McCarroll thought McCollough was complaining in bad faith in an attempt to escape the consequences of his poor performance. *Id.* However, at this stage of the proceeding, it is inappropriate for the court to seek to resolve a credibility dispute between the parties. *See, e.g.*, *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012) (explaining that "credibility determinations are for the fact finder").

**DONE** the 22nd day of September, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE